# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| Media Group, Inc., et al. | : | | |
| | : | | |
| Plaintiffs, | : | NO. | 3:02cv1814 (MRK) |
| | : | | |
| v. | : | | |
| | : | | |
| | : | | |
| Raymond Tuppatsch | : | | |
| | : | | |
| Defendant. | : | | |

## <u>RULING ON MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs brought this action alleging racketeering, fraud, and various other related claims against Defendant Raymond Tuppatsch. Tuppatsch now moves for summary judgment [doc. #26], arguing that Plaintiffs' claims are barred by two prior judgments in Tennessee state court and/or by the terms of a release signed by the parties. For the reasons set forth below, the Court GRANTS the motion for summary judgment.

I.

Plaintiff corporations are owned and operated by Plaintiff Herman S. Howard and are known collectively as the "Media Group."[1]  The complaint alleges that Tuppatsch,[2] a former employee of Howard's companies, violated the Racketeering Influenced and Corrupt

---

[1] Unless otherwise noted, all references in this opinion to "Howard" or "Plaintiff" include both Plaintiff Herman Howard and his various companies, including Plaintiff Media Group, Inc.

[2] Unless otherwise noted, all references in this opinion to "Tuppatsch" or "Defendant" include both Defendant Raymond Tuppatsch and his various companies, including Mood Cosmetics, Inc. and American Industries Services, Inc.

1

Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., by engaging in a pattern of racketeering

activity involving alleged mail and wire fraud. Howard also asserts various state law claims

against Tuppatsch arising from the same conduct, including claims of fraud, breach of contract,

and breach of fiduciary duty. Briefly stated, Howard claims that through various alleged artifices,

Tuppatsch improperly took control of Mood Cosmetics, Inc. ("Mood") and American Industries

Services, Inc. ("AI") and thereafter used those companies to defraud and  misappropriate millions

of dollars from Howard and his companies. The present action is not the first legal battle between

the parties, but follows a series of actions in Tennessee state court. The factual background of the

cases and the relationships among the parties are described in greater detail in the Tennessee

decisions cited below, and this Court will detail the history of the case and the facts of the

dispute only to the extent necessary to address the present motion.

    As is relevant here, Howard first sued Tuppatsch on May 11, 2000 (Tennessee Lawsuit I)

in the Chancery Court of Davidson County, Tennessee, claiming fraud, breach of fiduciary duty,

and usurpation of corporate opportunities. Def's Mot. for Summ. J. [doc. #26], Ex. E. That

lawsuit included as parties the same individuals and entities who are parties to this action.[3] On

April 9, 2001, the Chancery Court granted summary judgment for Tuppatsch on the usurpation

claim, judicially estopped Howard from asserting that he held any interest in AI, and held in

abeyance Howard's other claims. *Id.* Ex. L. Howard later amended his complaint in Tennessee

Lawsuit I on June 22, 2001 (the "Amended Complaint"). *Id.* Ex. F. On August 1, 2001, the

Tennessee court dismissed all of Howard's claims "with prejudice" due to his failure to comply

---

[3]Plaintiffs National Communications Corporation and Feldman Industries, companies
affiliated with the Media Group, of which Howard is the sole shareholder as well as an officer
and director, Compl. ¶6, were not parties to the earlier Tennessee cases.

with discovery orders. Pl's Memo. of Law in Opp. to Def's Motion for Summ. J. [doc. #35], Ex.

B. The Tennessee Court of Appeals affirmed the Chancery Court's dismissal of Howard's claims.

*Howard v. Am. Indus. Servs.*, 2002 WL 31769115 (Tenn. Ct. App., Dec. 11, 2002). Plaintiffs did

not appeal that decision to the Tennessee Supreme Court, and the Court of Appeals issued its

mandate on February 20, 2003, thus concluding Tennessee Lawsuit I.

Tuppatsch then filed his own action against Howard and his companies in the Chancery

Court on December 31, 2001 (Tennessee Lawsuit II). This lawsuit sought damages for breach of

an Agreement and General Release (the "Release") that Howard had allegedly signed on

February 4, 2000. Under the terms of the Release, Howard agreed to "release all claims of any

type from the beginning of the world to February 28, 2000 . . . including, without limitation, all

claims arising out of any and all verbal agreements between the Parties . . . [and] including but

not limited to, any claims which have been asserted or could have been asserted in the past or

which could be asserted now or in the future. This Agreement and Release applies to all claims

whether arising under common law or statute or the law of any state or federal law or any

contract, express or implied; any provision of the Constitution of the United States, the State of

New York or any other State; and any provision of any other law, common or statutory, of the

United States, New York or any other jurisdiction." Def's Mot. for Summ. J. [doc. #26], Ex. D.

The Release also included a separate covenant not to sue.

The Chancery Court ultimately consolidated Tennessee Lawsuit II with another lawsuit

Tuppatsch had filed against Howard, seeking to recoup unpaid storage charges. Howard then

filed a counterclaim in Tennessee Lawsuit II on April 15, 2002, alleging claims relating to the

same underlying circumstances as those he had pressed in Tennessee Lawsuit I. *Id.,* Ex. P. On

June 26, 2002, the Chancery Court dismissed Howard's counterclaim under the Tennessee doctrine of prior suit pending, finding that "the subject matter of the counterclaim represents the same subject matter of litigation pending" in the earlier case. *Id.*, Ex. Q. Howard filed another counterclaim on July 24, 2002, again based on allegations stemming from the same circumstances alleged in Tennessee Lawsuit I, *Id.*, Ex. R., and once again the Chancery Court dismissed the counterclaim, finding that "the subject of the counterclaim is the same as a prior lawsuit [i.e., Tennessee Lawsuit I]." *Id.*, Ex. S.

On May 7, 2003, Howard returned to Tennessee Lawsuit I when he sought relief from the Chancery Court's August 1, 2001 judgment of dismissal. Pursuant to Rule 60 of the Tennessee Rules of Civil Procedure, Howard moved the court to amend its dismissal order, which explicitly stated that it was "with prejudice," and to specify that the dismissal not operate as an adjudication on the merits. *Id.*, Ex. T. The express purpose of this request was to ensure that the dismissal order did not bar the claims that Howard had asserted in this action in the District of Connecticut. *Id.* at 11-12. As the Chancery Court explained in its ruling on Howard's Rule 60 motion, "The plaintiffs, as represented by counsel in their motion and at oral argument, stated that they would be barred, by operation of the doctrine of res judicata, from prosecuting the Connecticut litigation unless this Court modifies the August 1, 2001 judgment." Aff. of Kenneth M. Bryant [doc. #39], Ex. 1, at 2. For several reasons, the Chancery Court refused to alter the terms of its August 1, 2001 judgment and denied Howard's motion on August 12, 2003, thus leaving the judgment in "full force and effect" as an adjudication on the merits of Howard's claims. *Id.*, at 4.

On September 23, 2003, the Tennessee Chancery Court in Tennessee Lawsuit II granted Tuppatsch's motion for partial summary judgment on liability, finding that Howard had breached

the Release by filing Tennessee Lawsuit I. Memorandum Opinion and Order [doc. #46]. After

reviewing the entire record, the Court concluded that Howard had demonstrated no disputed

genuine issue of material fact regarding the validity or scope of the Release. *Id.* at 3. Specifically,

the Court stated that Howard could not claim fraud in the inducement of the Release, as his

"allegations of fraud are the same allegations that were dismissed as part of this Court's dismissal

of [Tennessee Lawsuit I]. Under Tenn. R. Civ. P. 41.02(3), that dismissal serves as an

adjudication on the merits. Accordingly, under the doctrine of collateral estoppel, the defendants

are precluded from raising those grounds as a defense to the applicability of the Release in this

action." *Id.* at 4. Because the Chancery Court has not yet resolved the issue of Tuppatsch's

damages or the claim for unpaid storage charges, Tennessee Lawsuit II remains pending in the

trial court, where the court has scheduled a trial on all remaining issues to commence in April

2004.

Howard filed the present action in the District of Connecticut on October 11, 2002.

Tuppatsch answered the complaint and filed a counterclaim against Howard for breaching the

Release by filing this action. In his motion for summary judgment, Tuppatsch argues that

Howard's claims are barred for three independent reasons: (1) the doctrine of res judicata

prevents Howard from litigating this action because all of his claims were asserted or could have

been asserted in Tennessee Lawsuit I, which was dismissed on the merits on August 1, 2001; (2)

the doctrine of collateral estoppel precludes Howard from contesting the validity and scope of the

Release, which has already been determined definitively by the Chancery Court's September 23,

2003 partial summary judgment ruling in Tennessee Lawsuit II; (3) in any event, there is no

genuine issue of material fact regarding the validity or scope of the Release, which as a matter of

law bars the claims asserted in this action.[4]

II.

Summary judgment is appropriate when there is no dispute as to a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party carries the burden of demonstrating that there is no genuine material dispute of fact. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000). The Court will address each of Tuppatsch's arguments even though any one of them, if accepted, is sufficient to support summary judgment in Tuppatsch's favor.

A.    *Res Judicata*

Both parties agree that Tennessee law governs the question of the preclusive effect of the August 1, 2001 judgment of dismissal in Tennessee Lawsuit I.  As the Supreme Court stated in *Migra v. Warren City School Dist.*, 465 U.S. 75 (1984), "It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered. . . . Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgment emerged would do so." *Id*. at 81 (internal quotations and citations omitted); *see AmBase Corp. v. City Investing Co. Liquidating Trust*, 326 F.3d 63, 72

---

[4]In its motion for summary judgment [doc. #26], Defendant also asked this Court to invoke the doctrine of *Colorado River* abstention and stay these proceedings until the resolution of the Tennessee proceedings. Defendant acknowledged at oral argument that it was no longer pressing that request.

(2d Cir. 2003) ("Where there is a final state court judgment, a federal court looks to that state's rules of res judicata to determine the preclusive effect of that judgment."). The Court concludes that there is no genuine issue of material fact regarding the res judicata effect of the August 1, 2001 judgment of dismissal in Tennessee Lawsuit I. Therefore, this issue is appropriate for disposition on summary judgment. *Id.* at 72-75.

Tennessee follows the generally accepted principles of res judicata – or "claim preclusion" – and "bars a second suit between the same parties on the same cause of action as to all issues which were or could have been litigated in the former suit." *Collins v. Greene County Bank*, 916 S.W.2d 941, 945 (Tenn. Ct. App. 1995). To raise a successful res judicata defense, a party must satisfy four elements: "that (1) a court of competent jurisdiction rendered the prior judgment, (2) the prior judgment was final and on the merits, (3) the same parties or their privies were involved in both proceedings, and (4) both proceedings involved the same cause of action." *Lien v. Couch*, 993 S.W.2d 53, 56 (Tenn. Ct. App. 1998).

The first three of these elements are easily met in this case. The Tennessee Chancery Court is unquestionably a "court of competent jurisdiction." The judgment in Tennessee Lawsuit I was made final after issuance of the mandate by the Tennessee Court of Appeals, and, as the Tennessee Chancery Court recognized in its September 23, 2003 summary judgment ruling in Tennessee Lawsuit II, under the Tennessee Rules of Civil Procedure, the August 1, 2001 judgment of dismissal qualifies as an adjudication on the merits.[5] *See* Memorandum Opinion

---

[5] Rule 41.02(3) of the Tennessee civil rules expressly provides that "a dismissal under this subdivision and any dismissal not provided for in this Rule 41, other than a dismissal for lack of jurisdiction or for improper venue or for lack of an indispensable party, operates as an adjudication upon the merits." Tenn. R. Civ. P. 41.02(3).

and Order [doc. #46], at 4. Howard does not contend otherwise; indeed, he recognized as much

in his Rule 60 motion in Tennessee Lawsuit I.[6] *See also Madyun  v. Ballard*, 783 S.W.2d 946,

948 (Tenn. Ct. App. 1989). Finally, the same parties have been involved in all the proceedings.[7]

Thus, res judicata will apply if this Court determines that the two proceedings "involved the same

cause of action."

The Tennessee Court of Appeals addressed the doctrine of res judicata at length in

*McKinney v. Widner*, 746 S.W.2d 699 (Tenn. Ct. App. 1987):

> The doctrine of res judicata is based on the principle not only that the same parties in the same capacities should not be required to litigate anew a matter which might have been determined and settled in the former litigation, but that litigation should be determined with reasonable expedition, and not be protracted through inattention and lack of diligence.

> The rule requires that the whole subject of the litigation be brought forward by the parties, and the judgment concludes all matters, whether of action or defense, legally pertaining to that subject which, by the exercise of reasonable diligence, might have been brought forward.

> . . .

---

[6] Defendant also asked this Court to apply the doctrine of judicial estoppel to bar Plaintiff from asserting a position antithetical to that it asserted in a previous judicial proceeding involving the same set of facts. However, in the Second Circuit, to assert judicial estoppel, "the prior inconsistent position must have been adopted by the court in some manner." *Bates v. Long Island R.R.*, 997 F.2d 1028, 1038 (2d Cir. 1993). As the Tennessee Chancery Court did not adopt Howard's position, judicial estoppel is not appropriate.

[7] As noted *supra* footnote 3, National Communications Corporation and Feldman Industries were not parties to the earlier Tennessee cases. However, as Howard is the sole shareholder of each of these corporations as well as an officer and director of each, Compl. ¶6, this Court finds that there is an identity of interest such that any res judicata holding would apply to these parties as well. *See State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 180 (Tenn. Ct. App. 2000) ("In the context of both res judicata and collateral estoppel, the concept of privity relates to the subject matter of the litigation, not to the relationship between the parties themselves. Privity connotes an identity of interest, that is, a mutual or successive interest to the same rights."). Howard has never contended otherwise.

> This Court cannot accept the argument of appellant that, by disclaiming or failing to present a particular fact or theory supporting his action, a plaintiff may thereby reserve and preserve the disclaimed and unpresented fact or theory as an "ace in the hole" to be used as a ground for a second lawsuit based on such ground. To assent to plaintiff's insistence would be to condone piecemeal presentation of suits and defenses at the whim of the parties. Such is not the policy of our law and is contrary to the authorities set out above.

*Id.* at 705-06 (internal citations omitted). Therefore, in Tennessee, as in most other jurisdictions, the doctrine of res judicata operates to bar all claims that were asserted or, by the exercise of reasonable diligence, could have been asserted in the prior action. *See Collins*, 916 S.W.2d at 945; RESTATEMENT (SECOND) OF JUDGMENTS §24, 25.

The question thus presented is whether the claims in the present lawsuit are either identical to those brought in Tennessee Lawsuit I or could have been brought in that suit. As a preliminary matter, the Court must first determine which claims were dismissed in Tennessee Lawsuit I. Howard argues that the judgment of dismissal in Tennessee Lawsuit I encompassed only the claims that he asserted in his original Complaint in that action and that the dismissal did not include those that he alleged in his Amended Complaint. Howard makes that argument because, as explained below, even he recognizes that the claims he asserted in his Amended Complaint in Tennessee Lawsuit I are virtually identical to those alleged in this action. In Howard's view, the Chancery Court's dismissal could not have included the claims alleged in his Amended Complaint because he did not file the Amended Complaint until the day of the hearing on Defendant's Motion to Dismiss and the Motion to Dismiss was based on discovery disputes that predated the filing of the Amended Complaint. Pl's Mem. of Law in Opp'n to Summ. J. [doc. #35] at 21.

Plaintiff's argument is wrong as both a matter of law and as a matter of the undisputed

facts. Under Tennessee law, "an 'amended complaint,' complete in itself without adoption or reference to the original, supersedes and destroys the original as a pleading." *McBurney v. Aldrich*, 816 S.W.2d 30, 33 (Tenn. Ct. App. 1991). Thus, any dismissal necessarily dismisses the then-operative complaint in the case. Here, the Amended Complaint was filed on June 22, 2001 and the judgment of dismissal was not entered until August 1, 2001. As a matter of law, the August 1, 2001 judgment operated to dismiss the earlier filed Amended Complaint.

Moreover, it is undisputed, as a matter of fact, that the Tennessee Chancery Court intended its judgment of dismissal to include Howard's Amended Complaint. In its Ruling on Summary Judgment in Tennessee Lawsuit II, the Chancery Court described its judgment of dismissal as follows: "By Order entered August 1, 2001, this Court dismissed all of the claims asserted in the complaint and amended complaint in the *Howard Lawsuit*." Memorandum Opinion and Order [doc. #46], at 2. Furthermore, the Tennessee Court of Appeals itself expressly referred to the Amended Complaint in its decision affirming the judgment of dismissal. *Howard v. Am. Indus. Servs.*, 2002 WL 31769115, *2 (Tenn. Ct. App., Dec. 11, 2002). The claims dismissed on the merits in Tennessee Lawsuit I were, therefore, those that were asserted in Howard's Amended Complaint.

As Howard's counsel rightly admitted at oral argument, the gist of the Amended Complaint in Tennessee Lawsuit I is the same as that of the present complaint [doc. # 1] (the "Complaint"). Indeed, the Complaint in the present action is virtually identical to the Amended Complaint, except for the addition of RICO claims, but even those claims are based on the same underlying events alleged in the Amended Complaint in Tennessee Lawsuit I. In both pleadings, Howard argues that Tuppatsch cheated him by improperly taking control of Mood and AI, and

then operating those companies to misappropriate assets and defraud Howard in various ways, including overcharging for services, over-withholding payroll taxes, and cashing an IRS refund supposedly owed Howard. "As the [Tennessee Lawsuit I] court succinctly stated in its order dismissing the fraud claim, the plaintiffs claim 'that defendant Tuppatsch engaged in a program and course of conduct of diverting and transferring the funds of plaintiffs and converting the funds to his own use and benefit.'" *Howard*, 2002 WL 31769115, at *2. The complaints in both this Court and in the Tennessee Chancery Court recite this story, giving almost identical facts (occasionally verbatim) followed by a series of legal claims, which are essentially identical, except for the label "RICO," which surfaces only in this action.

The Court will return to the RICO claims momentarily, but a review of the other counts alleged by Howard demonstrates the similarity between the dismissed Tennessee Lawsuit I and the present case. Thus, Count Two in the present Complaint is a breach of fiduciary duty claim against Tuppatsch based on his role as an officer and CFO of the plaintiff corporations and the relationship between him and Howard, including Tuppatsch's alleged overcharging for services and redirecting funds for his personal benefit. Compl. [doc. #1] ¶60, 61. Count Two of the Amended Complaint asserts that "[a]s an officer of the Media Group companies, and because of the relationship of trust that had developed between Tuppatsch and Howard, Tuppatsch owed the Plaintiffs a statutory and/or common law fiduciary duty," and bases that assertion on the same allegations of overcharging and redirecting of funds that appear in Count Two of the present Complaint. Amended Compl. [doc. #26], Ex. F ¶29.[8] Unquestionably, these counts allege the

_____

[8]    For example, compare the following description in the Amended Complaint in Tennessee Lawsuit I with the Complaint in the present case:

11

identical cause of action against Tuppatsch.

Similarly, Counts Three and Four of the present Complaint assert claims of fraudulent misrepresentation against Tuppatsch in which Tuppatsch is alleged to have made certain statements to Howard in order to encourage him to continue the business relationship between Howard's companies and Tuppatsch's companies. Paragraphs 63 and 64 of the present Complaint detail the misrepresentations Tuppatsch is alleged to have made in this regard, including claims that Mood's ownership was placed in Tuppatsch's name solely to avoid a tax liability of about $12 million, that Tuppatsch owned Mood as Howard's nominee and subject to Howard's control, and that funds transferred from Howard's firms to Mood were solely for the purpose of covering Mood's operating costs. Compl. ¶63, 64. Count Three of the Amended Complaint, which also seeks recovery for misrepresentation, contains essentially the same allegations.

The remaining Counts of the Complaint were not pleaded as such in Tennessee Lawsuit I, but they clearly represent the legal equivalent of old wine in new bottles. The Fifth Count alleges

---

21. Raymond Tuppatsch concealed his intention to make American Industries and Mood Cosmetics into profit centers. Tuppatsch concealed the fact that he was making millions of dollars by providing a service that had previously been provided at cost. Tuppatsch concealed the fact that the amounts of money that were being transferred to American Industries and Mood Cosmetics were steadily increasing, were far in excess of operating costs, were not being used to upgrade and maintain the companies, and were finding their way into Tuppatsch's personal accounts.

Amended Compl. ¶21.

34. What Howard did not discover was that Tuppatsch began to conceal that Mood and AI were increasingly becoming Tuppatsch's own personal profit center, all at the expense of Howard and the corporate plaintiffs herein. After Champion's death, Tuppatsch intentionally concealed from Howard the fact that he, through Mood and AI, began to reap millions of dollars from the Media Group companies by providing them with services at inflated prices when those services had previously been provided at cost and which Howard believed were still being provided at cost.

Compl. [doc. #1] ¶34.

a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §42-110g(a). This

cause of action was not pleaded in Tennessee Lawsuit I. However, in both counterclaims Howard

filed in Tennessee Lawsuit II, he included claims of violation of the Tennessee Consumer

Protection Act, Def's Mot. for Summ. J. [doc. #26], Ex. P, R, and the Chancery Court dismissed

both counterclaims on the ground that "the subject of the counterclaim is the same as a prior

lawsuit [Tennessee Lawsuit I]." *Id.*, Ex. Q, S. This Court agrees with the Tennessee Chancery

Court. Merely changing the label placed on an otherwise identical set of allegations does not

make the claim a new or different cause of action for purposes of the doctrine of res judicata.

*McKinney*, 746 S.W.2d at 706.

Howard's Sixth Count in the present Complaint alleges that Tuppatsch breached a

contract with Howard's companies to provide them with financial and bookkeeping services,

including the production of financial books and records. Howard claims that "it became obvious

after March 2000 that neither Tuppatsch nor Mood" had created these records or performed the

services, and that Howard was forced to pay outside accountants to perform these duties. Compl.

¶75-79. If it was indeed "obvious" by March 2000 that Tuppatsch had breached a contract, that

allegation clearly could have been asserted in the Amended Complaint in Tennessee Lawsuit I,

which was filed on June 22, 2001. Accordingly, the claims alleged in the Sixth Count are barred

by the doctrine of res judicata. To rule otherwise would be to condone piecemeal adjudication of

claims, a proposition that Tennessee courts, among others, have soundly rejected. *McKinney*, 746

S.W.2d at 706.

Howard's principal claim in this action is for violation of RICO. Howard alleges that

Tuppatsch siphoned funds from Mood for his personal benefit. Howard bases this claim

primarily on Mood's and AI's alleged overcharging of Howard's companies and a series of bank transfers and deposits of IRS refunds that Tuppatsch allegedly directed to his personal accounts. Compl. ¶40-47.[9] Though the Amended Complaint does not specify the amounts and dates of the various bank transfers, it does contain numerous allegations of Tuppatsch's overcharging for his companies' services. *E.g.,* Amended Complaint, Def's Mot. for Summ. J. [doc. #26], Ex. F. ¶46-48, 68-70. The detail provided in the present Complaint may or may not better document Howard's case, but that additional detail does not change the essential nature of the underlying claim. As the Second Circuit noted in an analogous setting, "it does not matter that a RICO claim was not expressly asserted in the [earlier action], 'for it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies.'" *Saud v. Bank of New York*, 929 F.2d 916, 919 (2d Cir. 1991) (quoting *Expert Elec., Inc. v. Levine*, 554 F.2d 1227, 1234 (2d Cir. 1977).[10]

---

[9] Howard also includes in his Complaint in this action allegations regarding a series of telephone calls from Tuppatsch's residence to the Media Group's computers. Compl. ¶54. Howard labels these calls unauthorized entries into Howard's computer systems. However, Howard does not assert a separate claim of unauthorized entry but rather relies on this alleged conduct only as additional proof of the scheme giving rise to his RICO counts. *Id.* Indeed, Howard's counsel conceded as much at oral argument. The parties agree that a separate claim for unauthorized entry into Howard's computers would not be barred by res judicata since the alleged unauthorized entries occurred well after the events at issue in the Tennessee lawsuits and the current suit. However, Howard has not sued on such a separate claim but rather has asserted a RICO violation based primarily on events previously alleged in Tennessee Lawsuit I. Moreover, Howard has not filed a motion to amend his Complaint to assert such an unauthorized entry claim. Nothing in this Ruling is intended to bar Howard from filing a new lawsuit alleging unauthorized entry into his computer system as a claim that is separate and apart from the course of conduct and claims that are alleged in this action and in Tennessee Lawsuit I.

[10] As state courts have concurrent jurisdiction over civil RICO claims, *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990), Howard cannot evade res judicata by asserting that he could not have brought his RICO claims in Tennessee Lawsuit I.

Here, the alleged facts surrounding the occurrences are clear: Howard is accusing

Tuppatsch of taking control of companies he owned only nominally on Howard's behalf, and then

using those companies to extract excessive fees from the Media Group companies and divert

monies to his personal accounts. Whether these alleged factual circumstances and harms can be

labeled a violation of RICO, a breach of contract, breach of fiduciary duty, fraud, or unfair trade

practices, they are all part of a single cause of action, a cause of action that Howard has already

brought against Tuppatsch and that the Tennessee Chancery Court dismissed on the merits.

Howard cannot escape the operation of the doctrine of res judicata by inventing new legal labels

or theories to place upon the same cause of action that has already been adjudicated on the merits

by the Tennessee Chancery Court. The Court accordingly GRANTS Tuppatsch's Motion for

Summary Judgment on the grounds of res judicata.[11]

---

[11]The Court also notes the application of the Rooker-Feldman doctrine to this case. Under
Rooker-Feldman, federal courts lack subject matter jurisdiction "over claims that effectively
challenge state court judgments." *Kropelnicki v. Siegel*, 290 F.3d 118, 128 (2d Cir. 2002).
Neither party has addressed the applicability of this doctrine, but because it implicates subject
matter jurisdiction, the Court can raise a Rooker-Feldman challenge *sua sponte. Id.* The Second
Circuit has held that a claim "will be barred under the Rooker-Feldman doctrine if it would be
barred under the principles of preclusion." *Moccio v. New York State Office of Court Admin.*, 95
F.3d 195, 200 (2d Cir. 1996). The Second Circuit does not seem to have ruled on the precise
question of whether a District Court should prefer to base its decision on the ground of
preclusion or Rooker-Feldman when both might be applicable. As a matter of logic, one might
suppose that the Court should address issues of subject matter jurisdiction before addressing
affirmative defenses such as preclusion. However, other circuits that have addressed this
sequencing issue have declined to consider the applicability of Rooker-Feldman upon finding the
action barred by ordinary preclusion principles. *See, e.g., McWilliams v. McWilliams*, 804 F.2d
1400, 1400-01 (5th Cir. 1986); *Vorbeck v. Whaley*, 620 F.2d 191, 193 n.2 (8th Cir. 1980). Insofar
as the Court must undertake a res judicata analysis in any event in order to apply the Rooker-
Feldman doctrine, this Court chooses to take the more direct route and base its decision on
Tennessee's law of preclusion, though the Court notes that in view of that decision, the Court
necessarily holds as well that the Court lacks subject matter jurisdiction pursuant to Rooker-
Feldman.

B.    *Collateral Estoppel*

Tuppatsch argues in the alternative that Howard's claims in this case are barred because of the Release, Def's Mot. for Summ. J. [doc. #26], Ex. D, and that Howard may not challenge the validity of the Release in this action because, under the doctrine of collateral estoppel – or issue preclusion – Howard is bound by the Tennessee Chancery Court's summary judgment ruling in Tennessee Lawsuit II. That ruling determined that Howard had signed the Release, that the Release is valid, and that it barred the claims Howard asserted in Tennessee Lawsuit (and by extension, as discussed above, the claims alleged in this action as well). Howard does not dispute that he fully and fairly litigated the validity of the Release in the Tennessee Chancery Court. However, he argues that he is not prevented from relitigating that issue in this Court because the doctrine of collateral estoppel applies only to final judgments and the Tennessee court's partial summary judgment ruling was only an interlocutory order and not a final judgment.

Once again, this Court is required to accord to the Tennessee partial summary judgment ruling the same preclusive effect that a Tennessee court would give that ruling. *See supra* at 6-7. Tennessee law requires a proponent of collateral estoppel to demonstrate five factors:

> 1. that the issue sought to be precluded is identical to the issue decided in the earlier suit; 2. that the issue sought to be precluded was actually litigated and decided on its merits in the earlier suit; 3. that the judgment in the earlier suit has become final; 4. that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier suit; and 5. that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier suit to litigate the issue now sought to be precluded.

*Hampton v. Tenn. Truck Sales*, 993 S.W.2d 643, 646 (Tenn. Ct. App. 1999). The first two and last two of these factors are easily met (and Howard does not claim otherwise): The validity of

16

the Release is the precise issue decided by the Tennessee Chancery Court; the issue was actually litigated by the parties in connection with Tuppatsch's motion for partial summary judgment and was actually decided on the merits by the Tennessee court; Howard was a party to that action; and he and his companies had a full and fair opportunity to litigate the validity of the Release in Tennessee Lawsuit II. The only remaining question is whether the Chancery Court's partial summary judgment ruling is "final" within the meaning of Tennessee's collateral estoppel law.

Tuppatsch agrees that insofar as appealability is concerned, the partial summary judgment ruling is not a "final judgment," but rather is an interlocutory ruling that is not immediately appealable. Under Tennessee law, a judgment is final for purposes of appeal only "when it decides and disposes of the whole merits of the case leaving nothing for the further judgment of the court." *Saunders v. Metro. Gov't of Nashville & Davidson County*, 383 S.W.2d 28, 31 (Tenn. 1964). Here, the partial summary judgment ruling did not dispose of "the whole merits of the case" since the ruling did not award damages to Tuppatsch for breach of the Release and the ruling did not resolve Tuppatsch's claims for unpaid storage charges.

However, no Tennessee court has ruled on whether the standard of finality for collateral estoppel is the same as the standard of finality for purposes of appealability (or, for that matter, res judicata). As Tuppatsch points out, some courts (including the Second Circuit) as well as the drafters of the Restatement (Second) of Judgments have reasoned that the standards of finality for purposes of appealability and for collateral estoppel are not, and should not be, the same since each doctrine serves different purposes. *See Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 87-90 (2d Cir. 1960); *Zdanok v. Glidden Co.,* 327 F.2d 944, 955 (2d Cir. 1964); *Sherman v. Jacobson*, 247 F. Supp. 261, 267-72 (S.D.N.Y. 1965); *MetroMedia Co. v. Fugazy*,

17

983 F.2d 350, 366 (2d Cir. 1992). Thus, the Restatement provides that "for purposes of issue preclusion (as distinguished from merger and bar), "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." RESTATEMENT (SECOND) OF JUDGMENTS §13. Comment g to the Restatement specifies that in certain circumstances, to avoid "needless duplication of effort and expense in the second action to decide the same issue, . . . the wisest course is to regard the prior decision of the issue as final for the purpose of issue preclusion without awaiting the end judgment." *Id.*, §13 cmt g. This case would seem to present exactly these circumstances, as the parties just fully and fairly litigated the identical issue in the Tennessee court, and the only matter remaining in the case is a decision on damages.

However, as Tuppatsch's counsel acknowledged at oral argument, Tennessee law is well settled that a court can reconsider a ruling on partial summary judgment at any time up until the entry of final judgment. Tenn R. Civ. P. 54.02. Therefore, theoretically at least, the Tennessee Chancery Court could, at any time before resolving the remaining issues in the case, reconsider the validity of the Release and reach a different conclusion. Moreover, even though Tennessee courts frequently (though not invariably) adopt the positions of the Restatement when considering collateral estoppel or res judicata, Tuppatsch's counsel conceded that to date, only a handful of state courts have embraced the Restatement's position on finality and that other courts have emphatically rejected it. *See, e.g., Avondale Shipyards, Inc. v. Insured Lloyd's*, 786 F.2d 1265, 1269-72 (5th Cir. 1986). To decide this issue, the Court would have to make a prediction on what the Tennessee courts would do if confronted with this issue. Because the Court can dispose of the pending motion on other grounds without making a prediction on a relatively

18

controversial proposition in an uncertain area of state law, the Court declines to rule on Tuppatsch's state law collateral estoppel argument.[12]

C.    *Release*

Tuppatsch also argues that there are no genuine issues of material fact regarding the validity of the Release and that this Court should grant summary judgment for Tuppatsch on the Release for the same reasons stated by the Tennessee Chancery Court in its partial summary judgment ruling. In order to make a complete record in the event of an appeal, this Court will address this argument even though the Court's disposition of the res judicata issue is alone sufficient to justify summary judgment in favor of Tuppatsch.

As he did in the Chancery Court, Howard makes two arguments in response: first, he argues that there is a question of material fact as to whether he signed the agreement, since he

---

[12]  As the Rooker-Feldman doctrine, *see supra* note 11, applies equally to claim preclusion and issue preclusion, there remains a question whether the Rooker-Feldman doctrine bars this Court from considering Howard's challenge to the validity of the Release, an issue that he has already litigated in Tennessee state court and that he is free to appeal directly through the Tennessee state court system. Whether Rooker-Feldman applies to interlocutory orders issued by state courts remains undecided in some circuits. *See, e.g., Centres, Inc. v. Town of Brookfield*, 148 F.3d 699, 702 n.4 (7th Cir.1998) ("The applicability of the Rooker-Feldman doctrine to interlocutory decisions of state courts is an open question"). Unlike those circuits, however, the Second Circuit has held that the Rooker-Feldman doctrine applies to interlocutory orders. *Campbell v. Greisberger*, 80 F.3d 703, 707 (2d Cir. 1996) ("It cannot be the meaning of Rooker-Feldman that, while the inferior federal courts are barred from reviewing final decisions of state courts, they are free to review interlocutory orders."). Since the Rooker-Feldman doctrine does not require a final judgment and since this Court has already determined that the Chancery Court's decision satisfies all other requirements of issue preclusion, this Court quite likely lacks subject matter jurisdiction to consider Howard's challenge to the validity of the Release, an effort that in effect asks this Court to review the Chancery Court's decision regarding the Release. However, in view of the Court's decision on Tuppatsch's res judicata arguments, which fully dispose of all of Howard's claims, there is no need for the Court to decide whether the Rooker-Feldman decision also deprives this Court of subject matter jurisdiction to consider Howard's challenge to the Release.

states in an affidavit that he "does not recognize the purported signature" on the Release as his own. *See* Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. [doc. #35] Ex. M. ¶5. Second, Howard argues that the Release was not fairly or knowingly made, since at the time he executed it, he did not know of Tuppatsch's "many acts of fraud, misrepresentation, and breaches of fiduciary duty." *Id.* at 25. *See Mangini v. McClurg*, 24 N.Y.2d 556, 562-63 (1969).[13]

Cognizant of the need to give Howard the benefit of all reasonable inferences from the evidence, the Court nonetheless concludes after reviewing the entire record that Howard has failed to raise a genuine question of material fact as to the validity of the Release. First, as to his signature, Howard's mere assertion that he does not recognize his signature, unaccompanied by any denial that he ever signed a release or any other evidence that the signature on the document it is not his own, cannot be sufficient to raise a question of fact to avoid summary judgment. As the Supreme Court has held, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968) (alteration in the original and internal quotations omitted). Howard has set forth no facts in support of his carefully crafted denial, while Tuppatsch has submitted statements under oath from two of Howard's employees, one of whom was the notary public who notarized Howard's signature, both attesting that the signature on the Release is in fact Howard's. Def's Mot. for Summ. J. [doc. #26], Ex. U, V. *See Lone Star Indus., Inc. v. Nelstad Material Corp.*, 811 F.

---

[13]The release provides that it will "be governed by the laws of the State of New York." Def's Mot. for Summ. J. [doc. #26], Ex. D. ¶9.

Supp. 147, 149 (S.D.N.Y. 1993).

Second, on the question whether the Release is enforceable, Howard does not in fact

plead fraudulent inducement in the signing of the Release. His counsel admitted at oral argument

that Howard was represented by an attorney in the negotiations that resulted in the Release and

that Howard received consideration for signing the Release. Howard has submitted no evidence

that would support his conclusory assertion that at the time of the Release he did not know about

the alleged wrongs committed by Tuppatsch. In fact, he filed Tennessee Lawsuit I just three

months after signing the Release, a fact that alone suggests rather strongly that at the time of the

Release, Howard's claims against Tuppatsch were not unknown. Moreover, Howard has not

presented the Court with any evidence that information came to his attention during those three

months regarding Tuppatsch's conduct that was either unknown or undiscoverable before the

Release was signed. Finally, and most significantly, even if the Court assumes that Howard was

unaware at the time he executed the Release of the claims he asserts in this action, the plain

language of the Release expressly covers all claims, including those which were unknown at the

time of the making of the Release. As the *Mangini* Court holds, "the releasor . . . must sustain the

burden of persuasion if he is to establish that the general language of the release, valid on its face

and properly executed, is to be limited because of a mutual mistake, or otherwise does not

represent the intent of the parties." *Mangini*, 24 N.Y.2d at 563. Insofar as Howard claims neither

fraud nor mutual mistake and makes no assertion that the parties did not intend to release the

types of claims presented in this action, there is no basis for avoiding the plain language of the

Release. Howard has thus failed to raise a triable issue concerning the validity of the Release. *See*

*Booth v. 3669 Delaware, Inc.*, 92 N.Y.2d 934, 935 (N.Y. 1998).

Howard has also failed to raise a genuine issue of fact regarding the scope of the Release. As quoted above, *see supra* at 3, the Release includes "all claims of any type from the beginning of the world to February 28, 2000 . . . including, without limitation, all claims arising out of any and all verbal agreements between the Parties . . . [and] including but not limited to, any claims which have been asserted or could have been asserted in the past or which could be asserted now or in the future. This Agreement and Release applies to all claims whether arising under common law or statute or the law of any state or federal law or any contract, express or implied; any provision of the Constitution of the United States, the State of New York or any other State; and any provision of any other law, common or statutory, of the United States, New York or any other jurisdiction." Def's Mot. for Summ. J. [doc. #26], Ex. C. The statutory and common law claims asserted in this action fall comfortably within the scope of the Release. The claims are, therefore, barred.

Accordingly, Tuppatsch's Motion for Summary Judgment [doc. #26] is GRANTED. The Clerk is directed to enter judgment for all Defendants and against all Plaintiffs on all counts of the Complaint. Tuppatsch's counterclaim remains pending, however. Therefore, by January 15, 2004, the parties shall jointly submit a schedule for bringing the remaining issues in this case to conclusion.

IT IS SO ORDERED

/s/          Mark R. Kravitz

U.S.D.J.

Dated at New Haven, Connecticut: December 31, 2003

22